## JACKSON v. UNITED STATES.

Court of Appeals of District of Columbia.

Submitted March 7, 1928. Decided April 2, 1928.

No. 4705.

**1. Criminal law ⬤⟾981(2)—On petition for sanity inquisition after conviction, court must consider facts that insanity was not thought of before offense or during trial, nor suggested by accused's demeanor as witness (Code, § 927).**

On petition for sanity inquisition under Code, § 927, after conviction of rape, it was court's duty to consider fact that it did not occur to any one before commission of offense, nor to accused's counsel or court during trial, that he was insane, and his demeanor during long examination as witness did not suggest such fact.

**2. Criminal law ⬤⟾981(2)—Question on petition for sanity inquisition after conviction is whether doubt existed as to ability to distinguish right from wrong (Code, § 927).**

Real question to be determined by court, on petition for inquisition under Code, § 927, concerning sanity of one convicted of crime, is not whether he manifested idiosyncrasies, but whether doubt existed as to his ability to distinguish right from wrong on showing made, and surrounding facts and circumstances.

**3. Criminal law ⬤⟾981(2)—Petition for sanity inquisition after conviction of rape held properly denied (Code, § 927).**

Petition for inquisition, under Code, § 927, as to sanity of one convicted of rape, *held*, properly denied, where his mental irresponsibility was not thought of before offense or during trial, nor suggested by his demeanor as witness, and neither physicians' and laymen's affidavits nor surrounding facts and circumstances raised any doubt as to his ability to distinguish between right and wrong.

Appeal from the Supreme Court of the District of Columbia.

Philip Jackson was convicted of rape, and, from an order denying his petition for an inquisition concerning his sanity, he appeals. Affirmed.

John H. Wilson, of Washington, D. C., for appellant.

Peyton Gordon and W. H. Collins, both of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from an order in the Supreme Court of the District denying defendant's petition for an inquisition concerning his sanity.

On February 18, 1927, defendant committed the crime of rape. He was indicted on March 1, 1927, and his trial occurred on April 25th, 26th, and 27th, following. To a verdict of guilty, the jury, as authorized by section 808 of the Code, added the words "with the death penalty."

On May 6, 1927, motion for a new trial having been overruled, defendant was sentenced to be executed on July 1, 1927. Appeal was not prosecuted.

On June 30, 1927, the defendant's counsel filed a motion to stay the execution (set for the day following) for a period of ninety days, upon a suggestion of the possible insanity of the defendant. The court postponed execution to July 29, 1927, and made known to counsel the character of the show-

ing that would be necessary to warrant the court in submitting the question to a jury.

Thereupon affidavits were submitted, and on July 12, 1927, the court, in a carefully prepared opinion, denied the petition. ·

The court first considered the affidavits tending to show that the defendant is the offspring of an incestuous relation between brother and sister. Dr. Savoy, a general practitioner, in his affidavit, expressed the opinion that such offspring "never have been, nor never will be, normal, responsible, nor of sound mind or body, to the extent that their conduct among society, or in any other circumstances, is that of a responsible person." Dr. Whitby was of the opinion "that blood relation in marriage, per se, does not necessarily predispose the offspring to nervous diseases; whether the child will fall victim to mental disease as a result of intermarriage is not so much dependent on the close allied blood relation as it is dependent on the stock. One member of a parent may be victim of disease and such disease may not be transmitted to the child, but, if both parents are victims of disease, the chances for anatomical, physical, and mental degeneracy in the child are doubly increased."

The court observed that little light was afforded by these affidavits; that an examination of standard works on the subject "does not support any claim of theoretical insanity based upon the proposition stated." The court then quoted from standard authorities, fully sustaining the view he had expressed, and concluded "that, as shocking to the moral sense as is the situation mentioned, it nevertheless affords no basis for the premise that the offspring of brother and sister is thereby necessarily a person mentally impaired."

The court then considered a further affidavit by Dr. Savoy, to the effect that he had made a blood test of defendant and that it showed "a 4-plus reaction for syphilis." The court said: "Granting, for the purpose of the present motion, that the blood test of defendant indicates the presence of syphilis, and accepting Dr. Savoy's statement that defendant presents no outward manifestations of the disease, it surely cannot be that mental unsoundness, even prima facie, is indicated thereby. * * * To say that one who has that disease, and based upon that fact alone, is necessarily unsound of mind, is to assume a premise which not only is not supported by the opinions of those best competent by their experience and profession to judge, indeed to know, but it also runs counter to statistics."

The court then considered affidavits concerning "the real as distinguished from the theoretical or conjectural state of mind of defendant," as disclosed in certain affidavits of laymen, which, after careful analysis, the court characterizes as follows: "No showing has been made on behalf of defendant by those who by special study, training, experience and calling are best qualified to speak concerning matters of this kind; the only showing, in that regard, being by lay witnesses whose affidavits, while expressing the opinion that defendant is of unsound mind, are singularly lacking in the statement of facts upon which such a conclusion could reasonably and intelligently be based; many thereof, quite evidently, regarding the premise of an offspring from brother and sister as conclusively establishing a condition of insanity. Quite naturally, lay witnesses are not to be supposed to be mindful of the meaning of the words 'unsound mind,' 'crazy,' etc., as applied to the criminal law, or to criminal responsibility; and the mere statement of their conclusion in that regard may or may not be helpful, accordingly as their conclusion may or may not be supported by the facts stated and upon which their conclusions are based."

The court then referred to the fact that the defendant "was examined and testified as a winess in his own behalf at the trial, some 367 questions being propounded to him by his counsel, and some 424 questions by counsel for the government, to all of which he gave intelligent as well as responsive answers; and throughout the trial not an intimation was made by any one affecting the question of defendant's mental responsibility; nor was there anything, either in defendant's conduct, manner, or replies, to suggest, in the slightest degree, that defendant was not fully and entirely responsible from a mental standpoint. Furthermore, if the defendant then was, or now is mentally irresponsible from a legal standpoint, it might rather naturally be assumed that his counsel could neither have conferred with him intelligently nor advisedly have conducted his defense."

The court then adverted to the affidavit of Dr. Noyes, first assistant physican of St. Elizabeth's Hospital, concerning an examination of the defendant made at the joint suggestion of the United States attorney and counsel for the defendant. Dr. Noyes concludes his affidavit as follows: "In conclusion, therefore, I wish to report that in my opinion Philip Jackson is not insane, and suffers from no mental disorder except that of somewhat subnormal intellectual development."

Following his analysis of the showing made in behalf of the defendant, the court expressed the opinion "that no prima facie showing of insanity has been presented in this case to warrant or justify submitting to a jury the question of the sanity of defendant."

Section 927 of the Code in part provides that "whenever a person is indicted or is charged by an information for an offense, and before trial or after a verdict of guilty, prima facie evidence is submitted to the court that the accused is then insane, the court may cause a jury to be impaneled from the jurors then in attendance on the court or, if the regular jurors have been discharged, may cause a sufficient number of jurors to be drawn to inquire into the insanity of the accused, and said inquiry shall be conducted in the presence and under the direction of the court." In Gonzales v. United States, 40 App. D. C. 450, this provision of the Code was under consideration. The court said: "Whether a prima facie case has been made by the petitioner requiring submission of the issue to a jury is a question submitted to the sound discretion of the trial judge. If it were not so, if the court be compelled to grant an inquiry by jury as an absolute right of the convict upon any showing, a practice would be instituted productive of delay, and otherwise inconsistent with the due administration of justice. Every convict might avail himself of the right, repeating petitions interminably. The matter is wisely left to the sound discretion of the trial judge. Having conducted the trial through its various stages, he has had the opportunity to observe the accused, and he is ordinarily acquainted with the witnesses whose affidavits are produced in support of the petition. If a real doubt be raised as to the sanity of the petitioner, it may be presumed that the judge will give him the desired hearing by a jury. As in respect of other matters within the discretion of a trial court, its exercise will not lightly be disturbed."

The question, then, in the present case is whether the refusal of the court below to submit to a jury the question of the mental responsibility of the defendant constituted an abuse of the discretion with which the court was clothed.

[1] In connection with the theoretical showing made in behalf of the defendant, it was the duty of the court to consider that prior to the commission of this offense it apparently had not occurred to any one that defendant should be restrained of his liberty because of insanity; that, even when he was put on trial for a shockingly brutal crime, it did not occur to either his counsel or to the court that he was mentally irresponsible; and, finally, that his demeanor under the ordeal of his trial, and particularly during his examination and cross-examination, did not "suggest, in the slightest degree, that defendant was not fully and entirely responsible from a mental standpoint."

[2, 3] And, when it is considered that the real question to be determined by the court was not whether the defendant had manifested idiosyncrasies, but whether, on the showing made and the surrounding facts and circumstances, a doubt existed as to his ability to distinguish right from wrong, the correctness of the court's conclusion is apparent.

The judgment, therefore, is affirmed.

Affirmed.